Filed 4/15/21  P. v. Harness CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C087281 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-MH-SVPR-2015-0000086) |
| v. | |
| RICHARD HARNESS, | |
| Defendant and Appellant. | |

Defendant Richard Harness challenges his commitment as a sexually violent predator (SVP).  He argues the trial court erred when it admitted case-specific hearsay in two exhibits (exhibits 4 & 5) and expert testimony based on those documents, in violation of *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).  We will affirm the judgment.

1

FACTUAL AND PROCEDURAL BACKGROUND

The People filed a petition seeking defendant's commitment as an SVP. (Welf. & Inst. Code, § 6600 et seq.) The petition was based on defendant's conviction in 2005 for three counts of lewd or lascivious acts with a child under the age of 14 years. (Pen. Code, § 288, subd. (a).)[1]

A. *Documentary Evidence*

During the jury trial, the People admitted five exhibits. Exhibit 1 was a certified copy of the abstract of judgment for defendant's 2005 conviction in San Joaquin County case No. LF008254A for three counts of lewd and lascivious acts upon a child under the age of 14 years (§ 288, subd. (a)). Exhibit 2 was a certified copy of defendant's California Law Enforcement Telecommunications System (CLETS) report showing his criminal history dating back to 1998.

Exhibit 3 was a probation report for defendant's 2005 conviction, which detailed the factual basis for that conviction. It explained defendant, then 24 years old, had shown the eight-year-old victim pornography and touched her breasts and genitals multiple times over the course of a year. The victim was taken to urgent care to be treated for vaginal bleeding and stated defendant had sexually assaulted her. In a later interview, she stated defendant had digitally penetrated her. The report also stated defendant "has a pattern of criminal activity in regards to committing sex related offenses with minors," and noted defendant had previously admitted misdemeanor violations of sexual battery (§ 243.4, subd. (a)) and molesting a child (§ 647.6) in 1997.

Exhibit 4 was a probation report for defendant's 2004 conviction in Tuolumne County case No. CRF15128 for two counts of molesting a child (§ 647.6, subd. (a)). The report explained defendant had been at a campground when he approached two 10-year-

---

[1] Undesignated statutory references are to the Penal Code.

old girls and pulled open their shirts by the collar to look at their chests. He later told the girls " '[t]hey looked good' " and gave them a thumbs up sign. He acted "mentally challenged" and told the mother of one of the girls that he was 17 years old; the mother reported the incident when she discovered defendant was older. The report also noted defendant "admitted he is attracted to adolescent girls," and "knows that being attracted to 'kids' is not normal."

Exhibit 5 was a probation report for a juvenile proceeding under Welfare and Institutions Code section 602. The report detailed true findings in three separate juvenile petitions in 1997 and 1998. The petitions involved allegations of assault on a school employee (§ 241.6), battery on a school employee (§ 243.6), sexual battery (§ 243.4, subd. (a)), and molesting a child (§ 647.6). The assault and battery allegations involved two incidents in which defendant struck a teacher and a counselor. The sexual battery and molesting a child allegations involved several incidents over the course of a year where defendant had touched the genitals of two 8-year-old children over their clothes with his hand and a stick.

Before trial, defendant filed a motion in limine to limit the admission of hearsay statements, other than about the SVP-qualifying offense. He also asked the court to instruct the jury that any expert testimony including hearsay statements about defendant's past conduct should be considered only to explain the bases of the expert testimony, and not for the truth of the matter asserted. The prosecution also filed a motion in limine laying out relevant case law related to hearsay statements in expert testimony, including *Sanchez, supra*, 63 Cal.4th 665.

At the hearing on the motions in limine, the trial court stated it was "going to let the doctors testify about hearsay" because most of the statements would "come from the records and [defendant's] statements." The prosecution argued any hearsay evidence of the SVP-qualifying offense would be admissible under Welfare and Institutions Code section 6603, subdivision (a)(3), and any other hearsay statements "are basically

3

admissions of a party opponent." The court then decided to reserve the issue until the parties "sort[ed] out what records they seek to admit."

Shortly before seating the jury, the trial court addressed the issue again, noting it had reviewed the expert reports, which detailed defendant's statements to the experts about his criminal history. The court acknowledged defendant's objection, but explained it did not see any prejudice to defendant because he would be testifying and had spoken to all the experts, including the defense expert, about his prior convictions. The court concluded the experts could testify about defendant's criminal history, but reserved on the admissibility of any documents other than documents related to the SVP-qualifying offense.

After each party rested, the court admitted exhibits 1 through 5 into evidence, but determined exhibits 4 and 5 should not go to the jury.

B. *Dr. John Hupka*

Dr. John Hupka, a licensed clinical psychologist who had performed SVP evaluations for over twenty years, testified he evaluated defendant once in 2015 and again in 2017. To perform his evaluation, Dr. Hupka reviewed defendant's prison central file, which included probation officer reports, police reports, and rap sheet. Dr. Hupka also reviewed defendant's prison medical file, including records of treatment. Dr. Hupka interviewed defendant for approximately two hours.

Dr. Hupka described the facts of the 2005 predicate offense. In his interview with defendant, Dr. Hupka explained defendant acknowledged he had "pressured" and "coerced" the victim in the underlying offense and the conduct in the offense had gone "on for a long period of time."

With respect to defendant's juvenile offenses, defendant told Dr. Hupka that he had sex offenses from 1997. Defendant told Dr. Hupka the victim in this incident was a neighborhood boy between 11 and 13 years old. Defendant had "poked the boy with a stick" because the boy was bothering him, and the boy and his sister had claimed

4

defendant molested them. Dr. Hupka noted that the juvenile petition alleging defendant committed a sexual battery and molested the boy had been found true. He also noted that he did not think defendant's self-reported statements could be taken at "face value" and that he did not know "what actually happened objectively." Dr. Hupka noted that there was "not much in the way of data about" defendant's juvenile offenses in the record, but that defendant was charged with sexual battery and molesting a child when he was 17 years old. Defendant told Dr. Hupka that he began using child pornography when he was younger and had sexual fantasies about children. Finally, he noted that there appeared to be incidents involving assault on a school employee from the same year.

On cross-examination, Dr. Hupka acknowledged he did not "know the details of what happened" in 1997, but he did know that defendant "has three times come to the attention of courts, [on] three different occasions for sexual activity with children." He explained the precise details of the offenses were not important to his conclusions because the chief question was simply whether defendant was "acting out sexual attraction to children," and the "sustained petition tells me that there was something that happened there, something went on that was sexual between he and the boy." Even if nothing at all had happened in the incident, Dr. Hupka asserted his ultimate conclusion would not have been affected, given defendant's statements about "having such a long-term sexual attraction to children."

With respect to the 2004 offense, Dr. Hupka stated defendant was 24 years old when he approached two young girls, attempted to look down their shirts, and made comments about their breasts.[2] Defendant told Dr. Hupka he had befriended one of the girls, that he "gave a young girl a rock" as a present, and that nothing sexual occurred. Dr. Hupka acknowledged that he did not have much information about the incident, and

---

[2] Dr. Hupka was given a copy of the 2004 probation report the morning before he testified and had not seen the report before then.

5

that he had not had time to thoroughly review the probation report before testifying. He also noted defendant's behavior in this incident was consistent with statements defendant had made in his interview explaining he preferred to think about female children while masturbating.

The next day, on cross-examination, Dr. Hupka had reviewed the probation report and summarized the incident by saying defendant "was staying in a campground. There was a family camping apparently next to him or near him, that there were two children that were playing, and he played with the two young girls." Defense counsel pressed Dr. Hupka on whether he could make a conclusion about defendant without knowing the full details of the incident, and Dr. Hupka responded, "[t]here's very little information about what happened with these two girls, but it sounds like there wasn't a terribly lot that happened. There was no sexual intercourse. There was no sodomy. He didn't force the girls to orally copulate him. [¶] He was involved in some, what sounds like, sexualized child play. . . . I think there's enough information to know that that was a pedophilic incident." When further pressed by defense counsel, Dr. Hupka recited the factual basis in the probation officer's report, saying defendant pretended to be a developmentally disabled 17-year-old to play with two 10-year-old girls at a campground.

Based on his interviews with defendant and his review of defendant's records, Dr. Hupka opined that defendant suffered from pedophilia, or sexual attraction to children. Dr. Hupka described defendant's developmental history as "a complete disaster," in that he came from "a dysfunctional family with substance abuse and mental illness in the family" and suffered sexual abuse as a child. He had also been placed in several group homes and psychiatric hospitals, and had received treatment for suicidal ideation. He had poor judgment and often perceived children as attempting to seduce him. Dr. Hupka noted that defendant's condition appeared to have worsened between 2015 and 2017, in that defendant was "much more closed off" and "less available to change." Ultimately, Dr. Hupka based his diagnosis on defendant's history, including his past convictions, his

6

upbringing, his lack of history in any treatment programs, and his lack of "resources for dealing with life."

Dr. Hupka opined defendant was likely to reoffend in a sexually violent way. Defendant scored in the "highest risk level" on the Static-99 test, an analysis that is commonly used to determine a defendant's risk of committing another sexual offense. Under the Static-99 analysis, defendant had a greater risk for reoffending because he had no history of intimate relationship, had a history of prior nonsexual violence (his juvenile assault finding), had six prior sex offense charges (two for sexual battery and child molesting in 1997, two for lewd and lascivious acts with a child, and two for annoying and molesting a child in 2004), had prior sexual victims who were unrelated, and had a prior male victim. Defendant also scored in the highest risk category in the Static-2002R, a different analytical tool used to assess a defendant's risk of committing another sexual offense. Defendant had poor self-regulation skills, had been on supervised release when he committed the qualifying offense, and had poor problem-solving skills. He was not motivated to seek treatment. In sum, Dr. Hupka opined defendant met the criteria for being an SVP.

C. *Dr. Christopher Matosich*

Dr. Christopher Matosich, a clinical psychologist, testified he had performed approximately 1,500 SVP evaluations since 1996. To evaluate defendant, Dr. Matosich reviewed defendant's central file and medical file, including any in-house SVP screenings, probation reports, and abstracts of judgment. He also interviewed defendant in 2015. Dr. Matosich stated his interviews take approximately two and a half hours.

When Dr. Matosich first interviewed defendant, he believed that defendant was at a lower risk of reoffending. He based this opinion on defendant's insight into his own deviancy and desire to seek treatment.

After the first interview, Dr. Matosich received additional documents from the State Department of State Hospitals. In particular, Dr. Matosich received defendant's rap

7

sheet, a probation report and police reports related to the 2004 sex offense, and additional mental health treatment records. Before receiving these documents, Dr. Matosich had only had information on defendant's juvenile offenses and the SVP-qualifying offense, but no information on the intervening period. After reviewing the new documents, Dr. Matosich changed his opinion.

Dr. Matosich explained the new documents showed defendant was on probation for his 2004 sex offense when he committed the SVP-qualifying offense in 2005. To Dr. Matosich, this highlighted the "persistency and intensity of his sexual deviancy." It also undermined Dr. Matosich's prior belief that defendant was genuinely interested in seeking treatment.

The 2004 probation report was "quite significant" in Dr. Matosich's analysis. On direct examination, the prosecution asked Dr. Matosich to explain the details in the probation report. Defense counsel objected, citing *Sanchez, supra*, 63 Cal.4th 665, and the court overruled the objection. Dr. Matosich explained defendant was at a campground and befriended two 10-year-old girls. The two girls reported that while they were playing, defendant pulled at their shirts and looked down their shirts. Defendant presented himself as a developmentally delayed 17-year-old to the girls' family. When he was confronted by a sheriff's deputy, defendant stated he had been previously convicted for similar behavior and was sexually attracted to girls. Dr. Matosich stated that these details did not change his diagnosis. The fact of the conviction and the ensuing probation, however, suggested an increased risk of reoffending because they meant defendant was on probation at the time of the 2005 SVP-qualifying offense. Thus, Dr. Matosich explained, it showed probation did not deter defendant from engaging in sexually deviant behavior.

8

Dr. Matosich also briefly described the details of a police report from 2000 involving defendant. In the incident, defendant attempted to use a telescope to peer into a woman's windows.[3]

With respect to defendant's juvenile offenses, Dr. Matosich stated that he did not have much information, but that defendant had told him the offense "was sexual because he was poking a boy with a stick back in 1997." According to defendant, "the victim stated he was being poked in the genital or anal area." All of the information Dr. Matosich testified to about the juvenile case was relayed to Dr. Matosich by defendant or contained on defendant's rap sheet.

After defense counsel cross-examined Dr. Matosich, the prosecution gave Dr. Matosich a copy of the probation report related to defendant's juvenile offenses. On redirect examination, the prosecution asked Dr. Matosich to explain the facts in the report, and Dr. Matosich explained that the incident involved two 8-year-old siblings, a boy and a girl. He explained that "[t]hey were molested by [defendant] . . . the male reported that . . . [defendant] put his hands over his clothing and molested him, and the female reported that [defendant] put his hands over her clothing, her vaginal area, as well as used the stick to poke her in her vagina." Dr. Matosich testified the additional details in the probation report did not change his opinion about defendant's likelihood to reoffend, although it did "reinforce" his opinion about defendant's diagnosis.

Dr. Matosich opined that defendant suffered from pedophilia, exclusive type. Dr. Matosich based his opinion on the facts that defendant's qualifying offense occurred over an extended period of time, defendant had previous convictions for sexual offenses on his

---

[3] During a break, the court admonished Dr. Matosich to avoid discussing the 2000 incident, based on defense counsel's *Sanchez* objection. The court offered to give a limiting instruction to the jury on the incident, but noted that the instruction might draw undue attention. Defense counsel responded "[i]t's not that I'm not asking for a limiting instruction, but I certainly don't want it right now."

9

rap sheet, and defendant's self-admissions about his sexual attraction to children. Defendant had a "difficult" and "chaotic" childhood that was characterized by sexual, emotional, and physical abuse. As a result, defendant could "have difficulty conforming and being nonaggressive and being appropriate in social situations."

Dr. Matosich believed defendant was likely to reoffend. Based on the Static-99R test, Dr. Matosich determined defendant had a "well above average risk of sexual recidivism."[4] Under the Static-99 analysis, defendant had a greater risk for reoffense because he had no history of intimate relationships, had a history of prior nonsexual violence, had six prior sex offense charges, had prior sexual victims who were unrelated, and had a prior male victim.

Dr. Matosich conducted a structural risk assessment of defendant, which assessed defendant's "psychological vulnerabilities, risk, and treatment need." This test determined defendant was at a high risk of reoffending because defendant admitted he had a longstanding sexual interest in children, lacked any emotionally intimate relationships with adults, and had "emotional congruence" with children, in that he mirrored child interaction to fulfill his sexual interests.

Dr. Matosich also determined defendant scored in the moderate range of the Hare Psychopath Checklist, a measure of the amount of psychopathy an individual possesses. This enhanced defendant's risk of recidivism because it indicated he would proceed to pursue his own sexual desires without regard for rules or regulations and suggested impairment in making decisions.

Dr. Matosich concluded that defendant was likely to reoffend in a predatory manner because his profile included callousness towards his victims, consistent

---

[4] Dr. Matosich initially scored defendant in a lower range, but later adjusted the score after receiving the new documents.

victimization of young children, and a lack of treatment. Dr. Matosich opined defendant met the criteria for being an SVP.

D. *Dr. Kathleen Longwell*

Dr. Kathleen Longwell, a psychologist who had performed over 3,000 SVP evaluations, evaluated defendant in 2015 and again in 2017. Dr. Longwell reviewed, among other things, defendant's mental health evaluations and treatment records, probation reports, police reports, and rap sheet. Her interviews generally take approximately one and a half hours.

In his first interview with Dr. Longwell, defendant admitted all the facts of the underlying SVP offense, consistent with the information in the probation report. In the second interview, he denied the offense and told Dr. Longwell she "got it wrong" in her previous report.

Dr. Longwell diagnosed defendant with pedophilic disorder, exclusive type, and bipolar one disorder. She based her diagnosis on defendant's admission that he had viewed child pornography for many years and had sexually molested children over a long period of time. It was also based on defendant's criminal record, including his convictions, the underlying police reports, and the probation reports, as well as statements he had made to her and to other evaluators. Specifically, Dr. Longwell singled out a juvenile case involving a male and female victim and a 2004 conviction involving two girls, although she did not describe any underlying facts.

Dr. Longwell based the bipolar diagnosis on defendant's treatment records from psychiatric hospitals, inpatient facilities, and prison. As a result of the bipolar disorder, defendant had delusions that led him to believe his treating physician and other patients were trying to sexually molest him or were sexually attracted to him. He viewed himself as an "upstanding individual" and thought it was abusive for others to question his beliefs. These symptoms made it difficult for him to be self-aware about his pedophilia or engage in treatment in a meaningful way, and, consequently, raised his risk of

11

recidivism.  Bipolar symptoms also made it more likely that defendant would act on sexual urges impulsively and display poor judgment.

Dr. Longwell opined defendant had an "exceptionally high risk" to reoffend.  She based that conclusion on defendant's "attitude towards his condition, his denial of his condition," and "his attitude towards treatment."  In particular, defendant had repeated sex offenses after saying that he would not do it again, did not engage in treatment when it was offered because he viewed it as "abusive and harmful," and had no realistic plan to avoid offending again.

Defendant scored a six on the Static-99R test, or "well above average" initially, but Dr. Longwell realized while testifying she had made a mistake and he should have scored a seven.  On the Static-2002R, defendant also scored a seven, which meant he had a "well above average risk to reoffend."

Dr. Longwell also scored defendant on the Violence Risk Appraisal Guide, a tool that "measures the risk of someone committing another violent offense, whether it's sexual or nonsexual."  Defendant scored in the 75th percentile on this test.  Finally, Dr. Longwell performed a Structural Risk Assessment - Forensic Version examination, which incorporates protective factors that might prevent an individual from committing a sex offense.  This assessment determined defendant was "at a high risk to commit another violent sex offense."  Dr. Longwell concluded "[e]very which way you look at it, everything points in the same direction, that [defendant's] a high risk of committing another sexually violent and predatory offense in the future if he were to be released at this point."  She opined that defendant fell within the purview of the SVP Act.

E.  *Dr. Alan Abrams*

Dr. Alan Abrams, a psychiatrist, testified as an expert for the defense.  He had performed approximately 60 SVP evaluations in the past.  To evaluate defendant, he reviewed the expert reports produced by the psychologists hired by the State Department of State Hospitals.  He also reviewed defendant's central file, which contained the

12

probation report for the qualifying offense, and an evaluation report by a doctor who examined defendant when he was 17 years old. Dr. Abrams did not review the probation report for defendant's juvenile offenses, although he was aware of defendant's juvenile convictions. Nor did he review the probation report for the 2004 offense. He interviewed defendant for three hours in 2018.

Dr. Abrams criticized the prosecution experts for conducting brief and superficial interviews and relying too much on probation reports for the underlying facts of defendant's offenses. Dr. Abrams asserted that probation reports frequently fail to capture the "nuance" of the facts.

Dr. Abrams testified that defendant's developmental behavior was consistent with an autism spectrum disorder. In his view, autistic individuals often "misjudg[e] . . . the rules of social engagement" and may not set appropriate boundaries for sexual conduct.

Dr. Abrams disagreed that defendant suffered from pedophilic disorder or bipolar disorder. In Dr. Abrams's assessment, defendant's actions were the result of his "curiosity and wanting to explore something different than what we think of as love or attraction," rather than a disorder.

With respect to defendant's sex offenses, Dr. Abrams noted that there was never any "oral copulation or any attempt to climax." To Dr. Abrams, this meant that the offenses were not provoked by "an interest in sexuality, but something a little bit different." Regarding the 2004 offense, Dr. Abrams noted defendant only indicated attraction to "adolescent girls, not to children," and that this was inconsistent with pedophilia.[5]

Dr. Abrams criticized the use of the Static-99 test as a predictor of future sexually violent behavior, saying that its intended use was to assess which offenders would benefit

---

[5] Dr. Abrams did not initially review the probation report for the 2004 offense, but defense counsel provided him a copy during a break in his testimony.

from more services, rather than predicting sexually violent behaviors. While it could be used by nonclinicians to triage cases, it should not be used as any kind of predictive tool. Dr. Abrams estimated defendant's chances of reoffending at approximately 5 percent, but could not say whether any future offenses would be violent and predatory.

F. *Defendant*

Defendant denied he had any "issues" with pedophilia. With respect to his juvenile offenses, defendant recalled the case occurred when he was 17 years old. He testified that there were two separate offenses for assaults on school employees. In the first, he had a panic attack, blacked out, and woke up to find school people holding him down, and in the second, a teacher blocked his path to the school counselor and tried to grab him. He admitted there was a true finding regarding the sexual battery allegation. When defense counsel asked defendant about the "poking with the stick incident," defendant stated, "I was just upset with him and I was trying to actually get him out of there, and I don't think I handled that right at all. . . . I mean, I was just foolish, completely foolish." On cross-examination, he admitted knowing the sexual battery victims, but claimed he did not remember any of the facts of the incident.

With respect to the 2004 offense, defense counsel asked why defendant would "look under the girls' shirt," and defendant explained: "I wasn't even really -- I don't think I was thinking very good at all. [¶] . . . [¶] . . . I was -- geez, immature, stupid. I was just a stupid kid." On cross-examination, defendant claimed he did not remember looking down the girls' shirts. He acknowledged being mad at himself because he "had upset the girls," but was "uncertain" as to whether looking down their shirts caused any distress. He concluded that "nothing [was] meant by it if it even occurred, [and] it was a pure accident if it even happened."

Regarding the qualifying offense, defendant stated he was "trying to be kind and things went stupid."

Defendant denied he was attracted to prepubescent children. He said he did not remember telling any doctors that he used child pornography to masturbate. He did not want to participate in the sex offender treatment program. He stated he would not engage in any sexually violent predatory behavior if he were released from custody.

The jury ultimately found the petition true and the trial court ordered defendant committed to the custody of the State Department of State Hospitals.

DISCUSSION

Defendant contends the admission of exhibits 4 and 5, and the expert testimony about the contents of those exhibits, constituted inadmissible case-specific hearsay under *Sanchez, supra*, 63 Cal.4th 665.[6] Exhibit 4 was a probation report for defendant's 2004 conviction in Tuolumne County case No. CRF15128 for two counts of molesting a child (§ 647.6, subd. (a)). Exhibit 5 was a probation report for three separate juvenile petitions in 1997 and 1998. The petitions involved allegations of assault on a school employee (§ 241.6), battery on a school employee (§ 243.6), sexual battery (§ 243.4, subd. (a)), and molesting a child (§ 647.6).

Citing *People v. Burroughs* (2016) 6 Cal.App.5th 378 (*Burroughs*), defendant argues the case-specific hearsay evidence about his juvenile offenses and the 2004 offense painted him "as a man who began sexually violent predatory behavior since [*sic*] his teen years," and unfairly "strengthened the credibility of the experts' conclusions." Defendant also briefly argues these errors were violations of the confrontation clauses of the state and federal constitutions.

---

[6] Defendant treats the admission of the exhibits themselves and the testimony of the expert witnesses as separate issues. Because defendant's argument as to the exhibits is that their admission allowed the experts to provide hearsay testimony, the issues are intertwined and we will address them as one.

The People respond that defendant forfeited any claim to constitutional error because he did not raise any such objection at trial. The failure to raise an objection based on the confrontation clause generally forfeits the argument on appeal. (*People v. Redd* (2010) 48 Cal.4th 691, 730.) Each time the parties discussed the admission of testimony based on exhibits 4 or 5, the issue was discussed as a hearsay objection, rather than constitutional error. Although defendant preserved for appellate review the state law hearsay objections he made during trial under *Sanchez*, we agree with the People he has forfeited any claim of constitutional error under the confrontation clause. (See *People v. Yates* (2018) 25 Cal.App.5th 474, 487.)

The People further argue any state law error in admitting case-specific hearsay was harmless. We agree.

Under *Sanchez*, an expert may rely on and cite "background information accepted in [his or her] field of expertise," and hearsay. (*Sanchez, supra*, 63 Cal.4th. at p. 685.) However, experts are prohibited from testifying to case-specific facts, if such facts are outside the expert's personal knowledge and do not fall under an exception to the hearsay rule, or if they have not been independently established by competent evidence. (*Id.* at pp. 676-677.)

The Court of Appeal applied *Sanchez* to an SVP proceeding in *Burroughs, supra*, 6 Cal.App.5th 378. In *Burroughs*, the defendant refused to meet with the expert clinical forensic psychologist, so she had to rely upon documentary evidence to assess whether he satisfied the statutory criteria to be deemed an SVP. (*Id.* at p. 384.) The appellate court concluded the trial court erred in admitting into evidence portions of probation reports containing information about the defendant's prior record, personal history, hospital records, and terms and conditions of probation. (*Id.* at p. 410.) In addition, the experts were erroneously allowed to testify regarding details about uncharged offenses and the defendant's behavior while in state custody. (*Id.* at p. 404.) Significantly, the evidence included details about conduct for which the defendant was not charged or convicted,

16

including the defendant's repeated sodomy of a young boy, his use of a knife handle to penetrate a woman, and his gang affiliation while incarcerated. (*Id.* at pp. 404, 412.) The appellate court concluded the evidence was "exceedingly inflammatory," invited the jury to punish him for past offenses, and "substantially enhanced the credibility of the experts' conclusions about [the defendant's] mental state and likelihood of reoffending." (*Id.* at p. 412.) Because the trial court's error was prejudicial even under the lower *Watson* standard, the court reversed the judgment. (*Burroughs,* at p. 412; see *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) [the erroneous admission of hearsay does not require reversal unless "it is reasonably probable that a result more favorable to [the defendant] would have been reached in the absence of the error"].)

While *Burroughs* did not directly address the appropriate standard, we agree that *Watson* provides the most appropriate standard for assessing harmless error in this instance. (*People v. Duarte* (2000) 24 Cal.4th 603, 618-619; *People v. Flint* (2018) 22 Cal.App.5th 983, 1003-1004.) Under that standard, reversal is not warranted unless "it is reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error." (*Watson, supra*, 46 Cal.2d at p. 836.) "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)

Unlike *Burroughs,* however, the error here was harmless. Neither of the offenses described in exhibits 4 or 5 were "exceedingly inflammatory" and thus did not "invite[] the jury to punish him for past offenses." (*Burroughs, supra*, 6 Cal.App.5th at p. 412; see *People v. Roa* (2017) 11 Cal.App.5th 428, 454-455.) Defendant introduced evidence, both on cross-examination and using his own expert witness, that minimized the offenses. Dr. Hupka admitted on cross-examination that the 2004 offense "sound[ed] like there wasn't a terribly lot that happened" and Dr. Abrams asserted the offense indicated only an interest in "adolescent girls, not to children," which was inconsistent with pedophilia.

17

Dr. Matosich also testified that the fact of the conviction and defendant's ensuing probation, independent of the details of the crime, were what mattered in the SVP analysis. With respect to the juvenile offenses, Dr. Hupka similarly testified he did not have much information, but the precise details of the offense were not important and the existence of a sustained juvenile petition were all that mattered in his analysis. And, unlike *Burroughs*, defendant was convicted or had a sustained petition for the offenses described in exhibits 4 and 5, and was punished for the offenses, reducing the danger the jury would attempt to punish him for the prior conduct. (See *People v. Falsetta* (1999) 21 Cal.4th 903, 917.)

Moreover, unlike *Burroughs*, defendant spoke with the expert witnesses about his past offenses, duplicating much of the salient information contained in the probation reports. (See *People v. Yates, supra*, 25 Cal.App.5th pp. 486-487 [prejudice found and judgment reversed where experts in an SVP hearing testified regarding the defendant's criminal and hospital records and the defendant made only "a few admissions" during interviews with the experts].) With respect to the juvenile offenses, defendant told Dr. Hupka he had poked a young neighborhood boy with a stick and the boy and his sister had accused defendant of molesting them. He told Dr. Matosich he had poked a boy with a stick in 1997 and the boy claimed he had been poked in the "genital or anal area." Defendant also explained the basis for the assault on a school employee offenses in his own testimony.

On the 2004 conviction, defendant told Dr. Hupka the conviction involved befriending a girl at a campground and giving her a present. He told Dr. Hupka the girl accused him of molesting her and that he pleaded to the charges of annoying or molesting a child. When defendant testified, he admitted to the same facts and responded to a question asking why he looked down the girls' shirts by saying he was just "immature" and "stupid." Where defendant admitted these facts to the expert witnesses, his out-of-court statements are admissible party admissions and do not violate *Sanchez*. (Evid.

18

Code, § 1220; *Sanchez, supra*, 63 Cal.4th at p. 686 [an expert may relate as true case-specific facts asserted in hearsay statements if they are "proven by competent evidence or are covered by a hearsay exception"].) And where defendant testified to the same facts, his statements independently established the facts by competent evidence. (*Sanchez,* at p. 686.) We conclude defendant's claims of prejudice are without merit.

DISPOSITION

The judgment is affirmed.

/s/                      <br>HOCH, J.                       

We concur:

/s/
HULL, Acting P. J.


/s/
MURRAY, J.